**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**DAVID RODNEY LANDS,**

          **Plaintiff,**

   v.                                    **Civil Action 2:18-cv-249
Judge George C. Smith
Magistrate Judge Jolson**

**COMMISIONER OF
SOCIAL SECURITY,**

          **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff David Rodney Lands brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's non-disability finding and **REMAND** this case to the Commissioner and Administrative Law Judge under Sentence Four of § 405(g).

## I. BACKGROUND

Plaintiff filed his application for DIB and SSI in June 2014, alleging that he was disabled beginning April 23, 2012. (Tr. 192–99, PAGEID #: 242–49). After his applications were denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on February 21, 2017. (Tr. 34–66, PAGEID #: 81–113). On March 24, 2017, the ALJ issued a decision denying Plaintiff's applications for benefits. (Tr. 10–21, PAGEID #: 57–68). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–4, PAGEID #: 48–51).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on March 24, 2018 (Doc. 1), and Defendant filed the administrative record on May 29, 2018 (Doc. 7). Plaintiff filed his Statement of Errors (Doc. 8), Defendant filed an Opposition (Doc. 9), and Plaintiff filed a Reply (Doc. 10). Thus, this matter is now ripe for consideration.

### A. Relevant Hearing Testimony

Plaintiff was 44 years old at the time of the hearing. (Tr. 39, PAGEID #: 86). He testified that he graduated from high school and attended college for two years but does not have a college degree. (*Id.*). Plaintiff lives with his mother and stepfather, both of whom are retired. (Tr. 40, PAGEID #: 87). He receives food stamps and has been on Medicaid since 2013. (*Id.*). Plaintiff last worked at Greenpeace in 2011, where he worked as a community organizer. (Tr. 40–41, PAGEID #: 87–88). He explained that he was fired from that job because he frequently missed work and because his anxiety prevented him from being around people. (Tr. 41, PAGEID #: 88). Plaintiff also worked as a community organizer at Grassroots Voter Outreach and Grassroots Campaigns (Tr. 41–42, PAGEID #: 88–89), for a political campaign (Tr. 43, PAGEID #: 90), in advertising sales (*id.*), and at a bookstore (Tr. 44, PAGEID #: 91).

> Plaintiff testified that he is unable to work due to his mental health issues:
>
> It's a couple of reasons. First is the anxiety. Usually, when I get in around people, my anxiety really shoots up. I have to leave the situation. I can't even go to the grocery store by myself. I have to have my mother go with me. The second is the depression, which will hit about once a week; and then, every couple of weeks, I can be in bed for two to three days because of it. It gives me a lack of motivation and focus. And then, finally, I've had recently some psychotic episodes, which they're trying to treat.

(Tr. 44–45, PAGEID #: 91–92). Plaintiff explained that the "main trigger" for his anxiety is being around other people. (Tr. 45, PAGEID #: 92). As for his depression, Plaintiff explained that on a "bad day," he "can't even get out of bed," that his "body actually aches from it," that he cries, and that he is not motivated to do anything. (Tr. 46, PAGEID #: 93). He went on to say that sometimes it's "worse than that" because, on occasion, he can spend three days in bed and sleep for 24 hours

a time. (*Id.*). Plaintiff testified that this had happened two weeks prior. (*Id.*).

Plaintiff takes Abilify, Rexulti, BuSpar, Brintellix, Lamotrigine, Klonopin, Lithium, and Adderall for his mental health symptoms. (Tr. 46–47, PAGEID #: 93–94). He explained that he and his psychiatrist think that his attention issues stem from his depression. (Tr. 47, PAGEID #: 94). When asked to describe a day that he does not spend in bed, Plaintiff testified that he has an "extreme lack of motivation and focus," that anything he used to enjoy doing "went out the window," that he sits around the house "trying to motivate [himself]," and that he might go see a friend to try to cheer him up. (Tr. 48, PAGEID #: 95). He is able to take care of his personal hygiene, but sometimes may let it go for two or three days. (*Id.*). As for household tasks, Plaintiff can prepare simple meals, occasionally do his laundry, and help take out the trash. (Tr. 49–50, PAGEID #: 96–97).

Plaintiff further testified that he used to love spending time with friends, writing, reading, movies, music, and the outdoors; but those activities no longer interest him. (Tr. 50, PAGEID #: 97). He explained that when his family members visited on Christmas, he "kind of had to hide in [his] room from [his] family, because [he] was so anxious." (Tr. 52, PAGEID #: 99). He stays in touch with some friends via text message because talking on the phone triggers his anxiety. (Tr. 55, PAGEID #: 102). Plaintiff noted that his mother is "a real kind of strength" for him because she tries to cheer him up. (*Id*).

In response to his attorney's questioning, Plaintiff detailed his recent "psychotic" episodes. (Tr. 58, PAGEID #: 105). He explained that in the first incident, he believed he "was riding the internet" for three hours, and during the second incident, he sat in his room for hours, not knowing what to do, explaining that "nothing made sense" and that he "didn't know where [he] was at." (*Id.*). During another episode, Plaintiff explained that he "walked through the house and took [his]

3

clothes off, and didn't realize that was wrong." (*Id.*). During the final incident he recounted, Plaintiff, while spending time in Columbus, "didn't know what city [he] was in, and it took [him] about an hour for them to talk to [him], and talk [him] down, and figure out where [he] was at and that [he] was okay." (*Id.*). When asked what mental health issues would prevent him from working, Plaintiff answered that absenteeism, lack of focus, lack of motivation, anxiety from being around people, and fear of another psychotic episode would all prevent him from working. (Tr. 59, PAGEID #: 106).

Finally, a vocational expert ("VE") testified that Plaintiff could not return to any of his previous jobs but that he could perform the medium unskilled jobs of janitor, detailer, and laundry worker. (Tr. 63, PAGEID #: 110).

### B. Relevant Medical Background

An August 6, 2012, mental status exam indicated that Plaintiff was "well kempt, engaged and cooperative," but that his mood and affect was "anxious and depressed." (Tr. 321, PAGEID #: 374). Plaintiff did not receive treatment during 2013 because he was not insured during that time. (Tr. 38, PAGEID #: 85).

On January 24, 2014, Plaintiff presented with anxiety "to the point where he has unfounded and unrealistic fears and he stays on edge" and that his "feelings of depression [] cause him to have crying spells and he doesn't engage in activities he typically enjoys doing." (Tr. 337, PAGEID #: 390). On March 21, 2014, Plaintiff was noted as having anxiety and major depression. (Tr. 331, PAGEID #: 384). A mental status exam revealed that Plaintiff had "eating problems" and "sleeping problems," that his appearance was "disheveled," but that his speech and affect were "appropriate." (*Id.*). On July 11, 2014, Certified Nurse Practitioner Crystal Jordan ("Jordan") noted that Plaintiff had been experiencing increased depression since his last appointment, and that

4

"[a]fter talking with [him], it seems that he may be bipolar as well," noting that he "goes nights without sleep, he even says sometimes he gets 'manic,' has mood swings, irritability, impulsivity," and "pressured and rapid" speech. (Tr. 325, PAGEID #: 378). Records, dated August 8, 2014, mark a "notable change" in Plaintiff's "mood/affect," with worsened anxiety, fatigue and panic attacks. (Tr. 339, PAGEID #: 392).

On February 13, 2015, Plaintiff stated he was depressed and tired but indicated that he wanted to follow through with his efforts to enroll in college. (Tr. 407, PAGEID #: 460). On March 20, 2015, Plaintiff reported that his depression was "hitting hard about once weekly" but that his counseling sessions helped improve his symptoms. (Tr. 413, PAGEID #: 466). On May 8, 2015, Jordan noted that Plaintiff "still struggles with anxiety and depression, energy is low." (Tr. 425, PAGEID #: 478). On July 30, 2015, Plaintiff told Jordan that he was experiencing fatigue, depression, anxiety, low energy, lack of interest, low motivation, and some feelings of hopelessness. (Tr. 443, PAGEID #: 496). On October 23, 2015, Plaintiff told his therapist that he occasionally spent time with friends and was interested in volunteering. (Tr. 469, PAGEID #: 522). On December 4, 2015, Jordan noted Plaintiff's problems with depression and lack of motivation and indicated that he agreed to an increase in medications. (Tr. 482, PAGEID #: 435).

On January 26, 2016, Jordan reported that Plaintiff was doing "ok" on his Adderall prescription but that his "chief complaint" was his worsening depression. (Tr. 497, PAGEID #: 550). On March 9, 2016, Jordan completed a Mental Residual Functional Capacity Assessment on Plaintiff. (Tr. 357–60, PAGEID #: 410–13). She concluded that Plaintiff was not able to work on a regular and sustained basis in light of his mental health impairments, explaining that Plaintiff suffers from "[e]xtreme anxiety with physical symptoms such as chest pain, shortness of breath, tremors, etc." and that he is "[u]nable to perform tasks due to poor concentration and decreased

motivation and interest [related to] his depression." (Tr. 360, PAGEID #: 413). On March 9, 2016, Plaintiff told Jordan about a recent "delusional moment" he had experienced, and Jordan reported Plaintiff's primary issues as depression and anxiety. (Tr. 505, PAGEID #: 558). On April 26, 2016, Jordan prescribed Plaintiff a low dose of lithium for his depression and unstable mood. (Tr., 586, PAGEID #: 639).

During an April 29, 2016 therapy session, Plaintiff denied suicidal ideation, but his therapist opined that "it seems possible he is having passive ideation," and further indicated that he was "able to laugh and smile on occasion and appropriately." (Tr. 535–36, PAGEID #: 488–89). Records from April 2016 show that Plaintiff's "hands [shook] almost all the time," which "ha[d] previously been attributed to anxiety." (Tr. 536, PAGEID #: 589). On July 21, 2016, Plaintiff had a follow-up appointment with Jordan "for his schizoaffective disorder." (Tr. 558, PAGEID #: 611). Jordan reported no current suicidal or homicide thoughts or hallucinations but indicated that Plaintiff "has had some psychotic/delusions episodes since February ever since we stopped Abilify." (*Id.*). On December 22, 2016, Jordan treated Plaintiff for his mood disorder and Plaintiff was "agreeable to a slightly [sic] increase lithium level[.]" (Tr. 608, PAGEID #: 661).

### C. The ALJ's Decision

The ALJ found that Plaintiff had not engaged in substantial gainful activity since April 23, 2012, the alleged onset date. (Tr. 12, PAGEID #: 59). The ALJ determined that Plaintiff suffered from the following severe impairments: an affective disorder variously diagnosed as major depressive disorder and bipolar disorder, and an anxiety disorder variously diagnosed as generalized anxiety disorder, social anxiety disorder, and panic disorder. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 13, PAGEID #: 60).

Specifically, the ALJ concluded that Plaintiff's mental symptomatology did not result in at least two limitations or one extreme limitation in the areas of activities of daily living, social functioning, concentration/persistence/pace, or episodes of decompensation as required in "paragraph B" in 12.00 of the Listing of Impairments. (*Id.*). Rather, the ALJ found Plaintiff had moderate limitations in his ability to understand, remember, or apply information; mild difficulties interacting with others; moderate limitations with regard to concentrating, persisting, or maintaining pace; and moderate limitations in his ability to adapt or manage himself. (*Id.*). Thus, the ALJ held that Plaintiff did not satisfy the "paragraph B" criteria. (*Id.*). Similarly, the ALJ concluded that Plaintiff did not satisfy the "paragraph C" criteria. (Tr. 13–14, PAGEID #: 60–61).

As to Plaintiff's RFC, the ALJ opined:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations. The claimant is limited to simple, routine tasks that are not fast-paced and do not require strict production quotas.

(Tr. 14, PAGEID #: 61).

After considering the evidence, the ALJ concluded that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (Tr. 16, PAGEID #: 63). The ALJ elaborated on how he reached that finding:

> Upon mental status examination, the claimant appeared cooperative, had normal speech, normal insight and judgment, albeit with anxious and depressed mood and affect. However, treatment notes also show that the claimant's depression is remitting with medication. Although the claimant does report some depressive episodes and increased anxiety throughout his treatment, the longitudinal pattern of his mental health treatment shows improved mood and focus with medication, as further discussed below. Additionally, the claimant maintains contact with several friends and has a good relationship with his family. The claimant has not required any psychiatric hospitalizations. Mental status examinations revealed overall normal findings, as discussed further below.

7

(Tr. 16, PAGEID #: 63) (internal citations omitted).

As for the opinion evidence, the ALJ assigned Certified Nurse Practitioner Crystal Jordan's opinion "little weight." (Tr. 18, PAGEID #: 65). Jordan opined that Plaintiff had extreme limitations in his ability to: (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or proximity to others without being distracted by them; (6) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number of rest periods; (7) interact appropriately with the general public; (8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (9) travel in unfamiliar places or use public transportation; and (10) tolerate normal levels of stress. (Tr. 358–60, PAGEID #: 411–13). Jordan further opined that Plaintiff had marked limitations in his ability to: (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) understand and remember detailed instructions; (4) carry out very short and simple instructions; (4) make simple work-related decisions; (5) accept instructions and respond appropriately to criticism from supervisors; (6) respond appropriately to changes in the work setting; and (7) set realistic goals or make plans independently of others. (*Id*). Jordan concluded that Plaintiff was unable to work on a regular and sustained basis. (Tr. 360, PAGEID #: 413).

The ALJ had the following to say about Jordan's opinion:

> Crystal Jordan, CNP, completed a mental residual functional capacity in March 2016. Ms. Jordan opined that the claimant had marked limitations and understanding and memory, extreme limitations in concentration and persistence, marked to extreme limitations in social interaction, marked to extreme limitation in adaptation, would be off task more than 20 percent of the time, and is unable to work. The undersigned assigns this opinion little weight, as it is not supported by

8

detailed treatment or examination notes, and Ms. Jordan is not an acceptable medical source under our Regulations.

(Tr. 18, PAGEID #: 65).

Next, the ALJ assigned Plaintiff's Global Assessment of Functioning ("GAF") scores of 50 and 56 "some weight." (*Id.*). He then assigned the opinions of State agency consultants, Paul Tangeman, Ph.D., and Kristen Haskins, Psy.D. "significant weight." (*Id.*). The consultants opined that Plaintiff is limited to simple and non-complex multistep tasks in a setting that does not need close sustained focus, sustained fast pace, stringent time or production requirements. (*Id.*).

The ALJ then considered the third-party reports of Plaintiff's mother, sister, and neighbor. (*Id.*). Plaintiff's mother provided a written statement, in which she describes her relationship with Plaintiff, his ongoing issues with anxiety and depression, and explains that he "rarely leaves his room and sleeps for days," is "absent at family holidays" because of his panic attacks, and has "debilitating" depression. (Tr. 290, PAGEID #: 343). Plaintiff's sister also provided a written statement, in which she explains that Plaintiff stays in his room during family holidays, has lost interest "in everything he ever loved," and that she "feel[s] his condition is getting worse[.]" (Tr. 293–94, PAGEID #: 345–46). Plaintiff's neighbor, who has known Plaintiff since he was a child, also wrote a letter, wherein she explains that she "could notice [his] depression in his appearance and his behavior." (Tr. 296, PAGEID #: 348).

The ALJ had the following to say about these third-party reports:

> The claimant's mother, sister, and neighbor offered third-party reports. The undersigned considered these opinions and accords them little weight to these statements. Such statements are considered evidence from 'other sources.' These individuals are not medically trained and have not seen the claimant in any professional capacity. Further, the claimant's friends and family are understandably sympathetic to the claimant's complaints and the undersigned recognizes that this is a well-meaning effort to support the claimant's application for benefits.

9

(Tr. 18, PAGEID #: 65).

Finally, the ALJ concluded the following: "The evidence therefore supports a residual functional capacity of a full range of work at all exertional levels with mental limitations. The mental limitations accommodate the claimant's generalized anxiety disorder, bipolar disorder, and panic attacks." (*Id.*).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

While Plaintiff raises just one error before the Court, his assigned error is actually twofold. First, Plaintiff contends that the ALJ erred in her assessment of nurse practitioner Crystal Jordan's opinion. (Doc. 8 at 5–10). Second, Plaintiff alleges that the ALJ erred in evaluating third-party source statements from his mother, sister, and neighbor supporting his applications for disability. (*Id.* at 10–13).

10

## A. The ALJ's Assessment of Crystal Jordan's Opinion

Plaintiff asserts that "[t]he explanations offered by the ALJ for giving little weight to Ms. Jordan's opinion are not supported and are not justified reasons consistent with Agency policy." (*Id*. at 10). The Undersigned agrees.

As a nurse practitioner, Jordan is not an "acceptable medical source" pursuant to Social Security Ruling SSR 06-03P; instead she is an "other source." *See* SSR 06-03P (S.S.A.), 2006 SSR LEXIS 4, 2006 WL 2329939.[1] "Other sources" cannot establish the existence of a medically determinable impairment but "may provide insight into the severity of the impairment and how it affects the individual's ability to function. *Id.* at *2. The ruling notes that "[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners . . . have increasingly assumed a greater percentage of the treatment and evaluation functions handled primarily by physicians and psychologists." *Id.* at *3. Such opinions are "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other evidence in the file." *Id.* at *4. Accordingly, the ruling explains that opinions from non-medical sources who have seen the claimant in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion. *Id.* at *4–5. ALJs may also consider the degree to which the source presents relevant evidence to support the opinion, whether the source has a particular expertise, and "any other factor supporting or refuting the opinion." *Davila v. Comm'r of Soc. Sec.*, 993 F. Supp. 2d 737, 757–58 (N.D. Ohio 2014) (internal quotation marks and citations omitted). Accordingly, upon a court's review of the above factors, "it may be

---

[1] This regulation has been rescinded. It still applies, however, to claims (like this one) filed before March 27, 2017. 20 CFR § 404.1527.

appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." *Randazzio v. Colvin*, No. 2:13-CV-00689, 2014 WL 2560729, at *10–12 (S.D. Ohio June 6, 2014), *report and recommendation adopted sub nom. Randazzio v. Comm'r of Soc. Sec.*, No. 2:13-CV-689, 2015 WL 881511 (S.D. Ohio Mar. 2, 2015).

Relevant here, while the ruling distinguishes between "what an adjudicator must consider and what the adjudicator must explain" (SSR 06-03P, 2006 WL 2329939 at *6), the Sixth Circuit, "however, appears to interpret the phrase 'should explain' as indicative of strongly suggesting that the ALJ explain the weight as opposed to leaving the decision whether to explain to the ALJ's discretion." *Hatfield v. Astrue*, No. 3:07-CV-242, 2008 WL 2437673, at *2–3 (E.D. Tenn. June 13, 2008) (citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007)).

Based on the Court's evaluation of the medical record, Jordan treated Plaintiff for his mental health conditions for approximately two years, beginning in July 2014. (Tr. 325, PAGEID #:378). On March 9, 2016, Jordan completed a Mental Residual Functional Capacity Assessment. (Tr. 357–60, PAGEID #: 410–13). Based on her assessment, she found that Plaintiff had a number of serious functional limitations. (Tr. 358–60, PAGEID #: 411–413). She concluded that Plaintiff was not able to work on a regular and sustained basis in light of his mental health impairment, explaining that he suffers from "[e]xtreme anxiety with physical symptoms such as chest pain, shortness of breath, tremors, etc.," and that he is "[u]nable to perform tasks due to poor concentration and decreased motivation and interest [related to] his depression." (Tr. 360, PAGEID #: 413).

In assigning Jordan's opinion little weight, the ALJ provided the following two

explanations: (1) that it was "not supported by detailed treatment or examination notes" and (2) that Jordan "is not an acceptable medical source under the Regulations." (Tr. 18, PAGEID #: 65). Based on those two reasons, and without providing further explanation, the ALJ assigned Jordan's opinion little weight. (*Id*.).

Plaintiff contends that the ALJ's analysis of Jordan's opinion is incomplete. (*See* Doc. 8 at 8–9, Doc. 10 at 3). Specifically, she refers to the relevant factors under the regulations for evaluating non-medical source opinions. (Doc. 8 at 8, Doc. 10 at 3). She also cites the medical record, alleging that it "contains voluminous medical records from Shawnee Mental Health Center, including notes specifically from Ms. Jordan," and therefore, the ALJ erred in finding that Jordan's opinion was not supported by detailed treatment or examination notes. (Doc. 8 at 8, Doc. 10 at 2).

In response, Defendant acknowledges that an ALJ must consider all relevant evidence in the record, including evidence from "other sources," and should consider factors such as the length, nature, and extent of the relationship, the consistency of the opinion with other evidence, and the degree to which the source presents relevant evidence to support the opinion. (Doc. 9 at 4). But, according to Defendant, "the ALJ did just that and met her legal obligations." (*Id*.). Plaintiff expresses a justifiable confusion with Defendant's representation as Defendant "offers not [sic] citation to the record to support this contention." (Doc. 10 at 3). Indeed, all Defendant has to say in defense of the ALJ's threadbare explanation is that the ALJ "summarized" Jordan's statement and chose to afford the opinion little weight "because it was not supported by detailed treatment or examination notes." (Doc. 9 at 5). Defendant concludes, therefore, that "the ALJ's evaluation of the evidence proffered by Ms. Jordan was consistent with her duties under the law." (*Id*.). The Court finds that neither Defendant's bare-bone defense of the ALJ's explanation nor the ALJ's explanation regarding Jordan's opinion passes muster.

13

To start, the ALJ did not discuss the relevant factors for assessing a non-medical source opinion, namely, the frequency and length of Jordan's treatment of Plaintiff and the evidence she relied on in supporting her opinion. "While the ALJ need not give a formulaic recitation of the factors discussed in the Social Security regulations, the ALJ must ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning." *Woodcock v. Comm'r of Soc. Sec.*, 201 F. Supp. 3d 912, 923 (S.D. Ohio 2016) (internal quotation marks and citations omitted). Here, in evaluating Jordan's opinion, the ALJ failed to cite any of the relevant factors or provide any form of substantive analysis. Consequently, the Undersigned is unable to follow the ALJ's reasoning for discounting Jordan's opinion. Accordingly, remand is necessary for a proper and complete evaluation and explanation of Jordan's opinion. *See, e.g.*, *Randazzio*, 2014 WL 2560729, at *11 (recommending remand based on the ALJ's treatment of the nurse practitioner's opinion, and noting that the nurse practitioner was the only provider of mental health treatment, saw plaintiff regularly, prescribed medications, and provided a detailed record of plaintiff's symptoms); *Desantis v. Comm'r of Soc. Sec.*, 24 F. Supp. 3d 701, 710 (S.D. Ohio 2014) (recommending remand, noting that it was "not clear" whether the ALJ considered the relevant factors under the regulations, but that the nurse practitioner "possess[ed] a superior longitudinal knowledge of [plaintiff's] record," and that "her opinions [were] based on multiple treatment contacts over a significant period of time.").

The Court does not demand a perfect opinion; however, Jordan's opinion was entitled to more than the ALJ's one-sentence explanation. Indeed, the Sixth Circuit, "appears to interpret the phrase 'should explain' as indicative of strongly suggesting that the ALJ explain the weight as opposed to leaving the decision whether to explain to the ALJ's discretion." *Hatfield*, 2008 WL 2437673, at *2–3. A district court in this Circuit explained the ALJ's obligation in this regard:

> Here ALJ Jarvis dismisses the opinions of both [her nurse practitioner and her counselor] in short order, assigning them both little weight. While certainly within the ALJ's discretion, the ALJ fails to provide any explanation as to *why* she assigned the opinions little weight. In fact, the only information the ALJ provides about these opinions is that they are not consistent with the balance of the record and that Ms. Dillane's opinion is inconsistent with her own treatment records. No further explanation is given. Therefore, while not entitled to controlling weight, the Magistrate still finds that the decision of the Commissioner must be reversed and remanded for further discussion and explanation of the weight assigned to the opinions of Ms. Herwig and Ms. Dillane[.]

*Davila*, 993 F. Supp. 2d 737, 757–58 (N.D. Ohio 2014).

So too here. While the ALJ was not required to give Jordan's opinion controlling weight, she should have provided a more comprehensive explanation, consistent with the regulations, as to her reasoning for assigning Jordan's opinion little weight. *See Powell v. Colvin*, No. 1:13-cv-275, 2015 WL 137505, at * 8–10 (E.D. Tenn. Jan. 6, 2015 (recommending remand, in part, because the ALJ "failed to provide any basis for [his] completely conclusory finding" regarding the nurse practitioner's opinion).

Because the ALJ failed to properly weigh Jordan's opinion in accordance with the regulations, the Undersigned concludes that substantial evidence does not support the ALJ's non-disability determination. In such a situation, "the Court must determine whether to remand the matter for rehearing or to award benefits." *Woodcock*, 201 F. Supp. 3d at 923. "Generally, benefits may be awarded immediately 'if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.'" *Id*. at 924 (quoting *Faucher v. Sec'y of Health & Human Servs*., 17 F.3d 171, 176 (6th Cir. 1994)). A court should only award benefits in a case "where proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where proof of disability is overwhelming." *Id*. The Undersigned finds that proof of disability is not overwhelming. *See id.* Upon remand, the ALJ should properly consider and discuss Jordan's opinion and provide an

15

explanation that is consistent with the regulations when assigning weight to her opinion.

### B. The ALJ's Assessment of Third-Party Source Statements

Plaintiff also contends that the ALJ erred in failing to properly evaluate written statements from his mother, sister, and neighbor supporting his applications for disability. However, the Undersigned's decision to recommend reversal and remand on the first assignment of error alleviates the need for analysis on Plaintiff's remaining assignment of error. Nevertheless, if the recommendation is adopted, the ALJ may consider Plaintiff's remaining assignment of error on remand if appropriate.

## IV. CONCLUSION

For the above reasons, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the Administrative Law Judge under Sentence Four of § 405(g).

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:   November 26, 2018                    /s/ Kimberly A. Jolson
                                             KIMBERLY A. JOLSON
                                             UNITED STATES MAGISTRATE JUDGE